AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | Case No. 21-SW-159 |
| | ) | |
| FOUR DIGITAL DEVICES CURRENTLY IN THE | ) | |
| POSSESSION OF LAW ENFORCEMENT IN | ) | |
| WASHINGTON, D.C. UNDER RULE 41 | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1201(a)(1),(c), | *Kidnapping.* Using, carrying and possessing a firearm during and in |
| 18 U.S.C.. 924(c)(1), (2) | relation to, and in furtherance of, a crime of violence. First Degree |
| 22 D.C. Code §§ 2101, 4502 | Murder while Armed (Premeditated). First Degree Murder while Armed - |
| | Felony Murder. |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Riley Palmertree, Special Agent, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means).*

Date: _____ 05/28/2021 _____

_____
*Judge's signature*

City and state: _____ Washington, D.C. _____          Robin M. Meriweather, United States Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means        ☑ Original        ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
District of Columbia

In the Matter of the Search of
*(Briefly describe the property to be searched*

*FOUR DIGITAL DEVICES CURRENTLY IN THE
POSSESSION OF LAW ENFORCEMENT IN
WASHINGTON, D.C. UNDER RULE 41*

)
)
)
)
)
)

Case No.   21-SW-159

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:        Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia
*(identify the person or describe the property to be searched and give its location):*
See Attachment A, incorporated herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*
See Attachment B, incorporated herein.

**YOU ARE COMMANDED** to execute this warrant on or before _____ June 11, 2021 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Robin M. Meriweather _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 05/28/2021 _____

City and state: _____ Washington, D.C. _____

_____
*Judge's signature*

Robin M. Meriweather, United States Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  21-SW-159 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:  _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The devices to be searched include:

- **TARGET DEVICE 1**: Item 0181: Kyocera cell phone (Model: E6810, IMEI: 990006133440379);

- **TARGET DEVICE 2**: Item 0102: an iPhone 8, seized from SHELITA THOMPSON on June 20, 2018;

- **TARGET DEVICE 3**: Item 0194: an Apple iPad A1701, S/N: DMPVC3RSHP5; and

- **TARGET DEVICE 4**: Item 0103: an iPhone 5s (white), Model: A1533, IMEI: 013986001069645 with cracked screen (collectively, "the **TARGET DEVICES**").

The **TARGET DEVICES** are currently held as evidence in Washington, D.C.

## ATTACHMENT B

1.      All records on the **TARGET DEVICES** described in Attachment A, that relate to violations of 18 U.S.C. §§ 1201(a)(1), 1201(c), 924(c)(1), 1073, and 22 D.C. Code §§ 2101, 4502, including, for the period from March 1, 2018, until August 1, 2018:

   a.   Any and all records, documents, and materials pertaining to or showing a relationship between or among DARIN MOORE, GABRIEL BROWN, JOHN SWEENEY, JAMES TAYLOR, SHELITA THOMPSON, and any other co-conspirators involved in the above referenced offenses, including but not limited to photographs, videos, correspondence, text messages, emails, call logs, records, GPS data, saved contacts, and telephone numbers to the actual cellular phone being searched;

   b.   Records of or information about the **TARGET DEVICES**' Internet activity related to the above offenses, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

   c.   Any and all records, documents, and materials documenting any agreement(s) between the above referenced individuals with respect to the target offenses, or to the related home invasions;

   d.   Any records evidencing the conspiracy between DARIN MOORE, GABRIEL BROWN, JOHN SWEENEY, JAMES TAYLOR, and any other co-conspirators involved in the above referenced offenses;

   e.   Any records evidencing relationships between MOORE, BROWN, SWEENEY, TAYLOR, and the decedent or the decedent's associates;

f.   Any and all records, documents, and materials documenting any transfer(s) or payment(s) between and among the above referenced individuals as well as any unidentified coconspirators;

g.   Photographs and videos that are stored on the **TARGET DEVICES**, which show relationships between coconspirators, clothing worn during criminal acts, instrumentalities used during criminal acts (such as weapons or other items used during the home invasions), and proceeds from the target offenses or related home invasions;

h.   Any and all records, documents, and materials documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of money and assets derived from or to be used in the commission of the above offenses;

i.   Calendars, diaries, or other documents used to record schedules, meetings, conversations, or other events related to plans for the above offenses.

j.   All electronically stored records relating to cellular telephone transmission sites, call detail records with cell tower, cell sites, cell towers to which cellular telephone calls were made to and received from, including corresponding REPOL records, records relating to in-coming and out-going calls, and recorded phone history for the **TARGET DEVICES** between the dates set forth herein;

k.   Records reflecting the co-conspirators' state of mind as it pertains to the target offenses, including evidence of their consciousness of guilt;

l.   Records documenting any planning or preparation for the target offenses, including, but not limited to, efforts to locate the decedent or his associates, acquisition of

materials to be used during the offenses (including masks, gloves, and zip-ties), and access to firearms used during the target offenses;

m. Records reflecting BROWN's flight from law enforcement following the target offenses;

n. Communications between the co-conspirators and other witnesses following the target offenses;

o. Records reflecting why BROWN obtained a new telephone following the target offenses;

p. Evidence of THOMPSON's knowledge of the target offenses or the whereabouts of BROWN during the target offenses;

q. Evidence of THOMPSON's knowledge of BROWN's relationships to SWEENEY, MOORE, and TAYLOR;

r. Evidence of BROWN's access to THOMPSON's Acura;

s. Evidence of consciousness of guilt, including evidence of internet searches regarding the target offenses;

t. Records of or information about Internet Protocol addresses used by the **TARGET DEVICES**;

u. Calendars, diaries, or other documents used to record schedules, meetings, conversations, or other events related to plans for the target offenses;

v. Information stored on the **TARGET DEVICES** that may be necessary to access the **TARGET DEVICES** or to conduct a forensic examination of the **TARGET DEVICES**.

w.  Evidence of the attachment to the **TARGET DEVICES** of other digital devices or similar containers for electronic evidence, or of connections to social media accounts or cloud storage or backed up data;

x.  Records of or information about Internet Protocol addresses used by the **TARGET DEVICES**; and

y.  Evidence of the times the **TARGET DEVICES** were used.

2.  Evidence of user attribution showing who used or owned the **TARGET DEVICES** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF FOUR DIGITAL DEVICES CURRENTLY IN THE POSSESSION OF LAW ENFORCEMENT IN WASHINGTON, D.C. UNDER RULE 41** | **Case No: 21-SW-159** <br><br> **UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Riley Palmertree, Special Agent with the Federal Bureau of Investigation (FBI), Washington Field Office (WFO), Washington, D.C., being duly sworn, depose and state the following:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the four digital devices described in Attachment A, that are currently in law enforcement possession, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I have been employed as a Special Agent of the Federal Bureau of Investigation since May 2017.  I am currently assigned to the FBI Washington Field Office ("WFO") in Washington, D.C.  I am currently assigned to the Violent Crimes Task Force Squad CR-2, which focuses on the Washington, D.C. metropolitan area.  I have investigated violent crimes since approximately October 2017.  As part of my duties, I have investigated bank robberies, carjackings, kidnappings, fugitive cases, and other crimes of violence.  I have obtained search

warrants for electronic devices and social media accounts as part of my investigation of violent crimes, including kidnappings.

3.      Based on my experience and training, I am aware that:

a.      Those involved in kidnapping and robbery offenses often use cellular telephones or other electronic devices to facilitate the planning and execution of their criminal activities, including the text messaging features of their cellular telephones to further conceal their communication from law enforcement.  These individuals may periodically discontinue use of their telephones, acquire new cellular telephones to facilitate their criminal activities in order to thwart detection by law enforcement, and use and maintain multiple telephones subscribed in either their true or fictitious names;

b.      Individuals involved in kidnapping and robbery offenses use cellular telephones to take, or cause to be taken, photographs of themselves, their associates, and property they have stolen, including U.S. currency;

c.      Individuals engaged in kidnapping and robbery offenses often keep address and/or telephone books, reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, including computerized or electronic address and telephone records, of their associates; and these address or telephone books can often be found on their cellular telephones or other electronic devices;

d.      Electronic devices can store information for long periods of time and even when a user deletes information from a device; it can sometimes be recovered using forensics tools.

4.      Since this affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not set forth each and every fact learned during the course of this investigation.

Facts not set forth herein are not being relied upon in this affidavit in support of the warrant. I make this affidavit based, in part, on my personal knowledge and observations derived from my participation in this investigation, information provided by other agents and law enforcement officers, reports and data provided by other officers, which I have read and reviewed, and, in part, upon information and belief.

5.      On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts to show that there is probable cause to believe that DARIN CARLYLE MOORE, GABRIEL BROWN, JOHN SWEENEY, and JAMES TAYLOR have participated in offenses involving kidnapping, using, carrying and possessing a firearm during and in relation to, and in furtherance of, a crime of violence, and murder, in violation of 18 U.S.C. §§ 1201(a)(1), 1201(c), 924(c)(1) (2), First Degree Murder while Armed (Premeditated), in violation of 22 D.C. Code §§ 2101, 4502, and First Degree Murder while Armed - Felony Murder, in violation of 22 D.C. Code §§ 2101, 4502 ("the target offenses").  Specifically, there is probable cause to believe that the digital devices described in Attachment A and described in paragraph 6 *infra*, contain evidence and instrumentalities of violations of the aforementioned offenses, as more fully described in Attachment B.

6.      Your Affiant requests a search warrant to search:

a.   **TARGET DEVICE 1:** [Item 0181] a Kyocera cell phone (Model: E6810, IMEI: 990006133440379).[1]  The Kyocera cell phone was seized on June 27,

_____

[1] A search warrant was previously obtained for this device (20-SW-144, signed on June 4, 2020, by Judge Meriweather) and an extraction was done by the D.C. Department of Forensic Sciences using Cellbrite.  Search warrant 20-SW-144 was the second search warrant obtained for this device: law enforcement previously obtained a search warrant for this device (signed by Judge

2018, inside of a residence in Dillon, South Carolina, at the time of the arrest of GABRIEL BROWN on an arrest warrant related to the target offenses. Deputies from the United States Marshals Service advised law enforcement that at the time of Brown's arrest, family members of BROWN present at the residence identified **TARGET DEVICE 1** as belonging to BROWN. The Kyocera cell phone is currently at the D.C. Department of Forensic Sciences Digital Evidence Unit in Washington, D.C.

b. **TARGET DEVICE 2:** [Item 0102]: an iPhone 8, seized from SHELITA THOMPSON on June 20, 2018, from SHELITA THOMPSON, after she exited a vehicle operated by her boyfriend, GABRIEL BROWN, who fled from U.S. Capitol Police officers in a vehicle described *infra*. A search warrant for the iPhone 8 was signed on June 22, 2018 (18-SW-164) by Judge Meriweather and DFS Digital Evidence Unit completed an extraction of data from the device (report dated June 27, 2018). The item is currently located at MPD's Evidence Control Branch, in Washington, D.C.;

c. **TARGET DEVICE 3:** [Item 0194] an Apple iPad A1701, S/N: DMPVC3RSHP52. The iPad was provided to law enforcement by a relative of GABRIEL BROWN who advised law enforcement that BROWN possessed the iPad in South Carolina immediately before his arrest in this case and that

---

Robinson on July 9, 2018, 18-SW-00175); however, a data extraction could not be performed due to the limitations of technology at the time. The second warrant (20-SW-144) was obtained based on updates to technology that would allow DFS to access the device that could not previously be accessed when the search warrant was previously obtained in July of 2018.

the relative brought it from South Carolina to Maryland to return it to BROWN. A search warrant for the iPad was previously signed on October 11, 2018 (18-SW-288) by Judge Robinson and DFS Digital Evidence Unit completed an extraction of data from the device (report dated October 12, 2018). The item is currently located at MPD's Evidence Control Branch, in Washington, D.C.; and

d. **TARGET DEVICE 4:** [Item 0103] an iPhone 5s (white), Model: A1533, IMEI: 013986001069645, with cracked screen. The iPhone 5s was seized on June 20, 2018, from 12321 Quarterback Court, Bowie, Maryland, the residence of DARIN MOORE, during a search warrant that was executed at the residence after MOORE was arrested. A search warrant for the iPhone 5s was signed on June 22, 2018 (18-SW-164) by Judge Meriweather; however, the DFS Digital Evidence Unit was unable to complete an extraction of the device (report dated June 27, 2018). Dan Ogden, a Senior Digital Investigative Analyst at the Cybercrime Lab of the Computer Crime & Intellectual Property Section has advised that current technology may allow him to complete an extraction of data from the device. The item is currently located at MPD's Evidence Control Branch, in Washington, D.C. (collectively, "the **TARGET DEVICES**").

## PROBABLE CAUSE

### June 19, 2018, Kidnapping

7.      On Tuesday, June 19, 2018, at approximately 8:48 p.m., members of the Prince George's County, Maryland Police Department (PGPD) responded to the report of an armed kidnapping in the 700 block of St. Michaels Drive, Bowie, Maryland. According to witnesses, a

dark colored Nissan Maxima intentionally struck Mr. Andre Simmons, who was riding a moped. Specifically, a witness ("W-1") advised police that after Simmons was struck on the moped, two suspects exited the vehicle, displayed handguns, and used plastic zip-ties to bind Simmons' wrists. Simmons was then forced into the vehicle, which fled the scene. W-1 further advised that he believed that at least one of the firearms was equipped with a laser sight. A second witness ("W-2) was at a farther distance than W-1, but believed that three suspects may have exited the vehicle and attempted to force Simmons into the vehicle. Because W-2 was observing the abduction from a distance, W-2 could not provide detailed descriptions of the three suspects. Over the course of the next several hours, the kidnappers made several calls to a family member of Simmons using telephone number 202-222-8501, demanding ransom money in return for Simmons' safe release.

### Payment of Ransom Money

8.      At approximately 4:50 a.m., on Wednesday June 20, 2018, a family member of Simmons drove to 3439 Benning Road, NE, Washington, DC, where she dropped approximately $7,000 in cash at the direction of the kidnappers. Detectives in the area observed a vehicle pull up to the drop location and collect the money. This vehicle was identified as a black Acura with DC tag FL9471. The Acura fled from the area at a high rate of speed and was not stopped. The Acura is registered to SHELITA THOMPSON, with a listed address of 5002 Lee Jay Drive, Capitol Heights, Maryland.

### June 20, 2018 Homicide

9.      On Wednesday, June 20, 2018, at 6:23:57 a.m., the MPD gunshot detection system, ShotSpotter, detected nineteen (19) gunshots in the alley behind 627 Atlantic Street, SE. Citizens also called 911 to report the shooting. Upon arrival at the scene, officers located the decedent, an adult black male, on the ground, suffering from multiple gunshot wounds to the head and body.

The decedent's wrists were also bound together with plastic zip-ties. Personnel from the DC Fire and EMS Department arrived on the scene. Medics from Engine 33 examined the decedent and found no signs of life. The decedent was pronounced dead under the authority of Dr. Robert Holman at 6:40 a.m. The decedent's remains were transported to the Office of the Chief Medical Examiner for an autopsy. The decedent was subsequently identified as Mr. Andre Simmons, the victim that was kidnapped in Prince George's County the prior night.

<u>Identification of the Nissan Maxima</u>

10.     On May 29, 2018, at approximately 1:45 p.m., members of the PGPD responded to an address located in Bowie, Maryland for the report of a residential armed robbery.  Witnesses advised police that two armed suspects entered an occupied residence, held victims at gunpoint, and stole property. The suspects fled the scene in a black four-door sedan. A video camera in the area captured the suspect vehicle, which was identified as a black 2014 Nissan Maxima with Maryland tag 1DJ3921 (VIN 1N4AA5APXEC905836) [hereinafter, "the Maxima"].  The Maxima is registered to DARIN CARLYLE MOORE. Based on this information, PGPD detectives obtained Circuit Court for Prince George's County Search Warrants to further their investigation, including a search warrant to install a GPS tracking device on the Maxima.

11.     Based on the common lookout in the June 19, 2018, armed kidnapping of Simmons, detectives examined the GPS location data for the Maxima and discovered that at the time of the kidnapping, the Maxima was at the scene of the kidnapping in the 700 block of St. Michaels Drive, Bowie, Maryland, shortly before police received the call for the armed robbery. Specifically, the GPS data shows that the Maxima arrived in the neighborhood at 8:39 p.m. GPS data showed that the Maxima stopped in the neighborhood and then left the area at 8:43 p.m. The Maxima then traveled westbound on Central Avenue at speeds reaching 89 miles per hour, towards Washington,

DC. GPS data then showed that the Maxima remained in the Southeast, Washington, DC area overnight.

12.     A review of the GPS location data for the Maxima showed that on June 20, 2018, at 6:23:57 a.m., the Maxima entered the alley behind 627 Atlantic Street, SE, Washington, DC, where Simmons was shot and killed. ShotSpotter detected nineteen (19) gunshots at 6:23:59 a.m.; two seconds after the Maxima arrived at that location. The Maxima remained in the alley for 28 seconds before leaving the area.

13.     Shortly after the murder, according to the GPS data, at 6:44 a.m., the Maxima arrived at SHELITA THOMSPON'S address located at 5002 Lee Jay Drive, Capitol Heights, Maryland.  As noted supra, THOMPSON is the listed owner of the Acura used to pick up the ransom money, which fled from police. The Maxima was stopped at this location until 7:09 a.m.

14.     The GPS data for the Maxima shows that after leaving THOMPSON's residence, the Maxima traveled to the 600 block of Elmira Street, SE, Washington DC.  According to the GPS data, the Maxima stopped in front of 623 Elmira Street, SE, for 50 seconds beginning at 7:38 a.m.  Law enforcement reviewed footage from a CCTV camera in the 600 block of Elmira Street, SE, Washington, DC, during this window of time.

15.     The CCTV camera rotates 360 degrees on a timed loop.  At 7:38 a.m., the Maxima is observed on video driving in the 600 block of Elmira Street, SE. The Maxima then stopped in the middle of the block for approximately one minute and a subject wearing a dark shirt, appearing to have a long hairstyle exited the Maxima, and walked to a silver vehicle parked along the curb. The Maxima was then captured on video leaving the block and turning south on 6th Street, SE, which corresponds to the GPS data. At 7:41 a.m., when the camera pans back to where the Maxima initially stopped, it appeared that the subject that got out of the Maxima was leaning inside an open

door of a parked vehicle. When the camera panned back to this vehicle two minutes later, the door
was closed and the subject was no longer in view of the camera.

<u>Search Warrant at Moore's Girlfriend's Residence</u>

16.     After this stop, the Maxima proceeded to 12321 Quarterback Court, Bowie,
Maryland, which is the residence of MOORE's girlfriend.  A search warrant was obtained for
12321 Quarterback Court, Bowie, Maryland.  Members of law enforcement contacted Defendant
MOORE and he refused to exit the residence for several hours before eventually surrendering.
MOORE was inside of the residence with his six-year-old daughter, who was subsequently
interviewed by detectives. In summary, Defendant MOORE's daughter told detectives that she
observed Defendant MOORE hiding cash in various locations in the house, breaking a cellphone
and hiding it in a dresser, and changing his pants. She also told detectives that prior to surrendering
to police; Defendant MOORE hugged her and said that he was going to jail and that he would not
see her for a long time.

17.     During a search of the residence, detectives found $2,099 in cash and **TARGET
DEVICE 4** (the white iPhone with the cracked screen) in the locations described by Defendant
MOORE's daughter.  Specifically, **TARGET DEVICE 4** was recovered from a dresser drawer in
MOORE's girlfriend's bedroom). Detectives also located in the washing machine the pants he had
taken off. The Maxima was seized by law enforcement and towed to the DC Department of
Forensic Sciences lab, pending a search warrant.  In plain view on the front passenger seat of the
Maxima, detectives observed plastic zip-ties consistent with those that were observed on the
decedent's wrists.  There was damage to the Nissan Maxima that was consistent with the accounts
of the witnesses on the scene of the kidnapping, who advised that the Maxima struck Simmons'
moped, as well as another vehicle during the kidnapping.

<u>Attempt to Stop the Acura & Identification of Gabriel Brown</u>

18.     On June 20, 2018, at 8:32 p.m., the United States Capitol Police (USCP) received a License Plate Reader (LPR) notification, which was broadcasted via USCP communications. The LPR notification was for a Black Acura TL bearing DC Tag FL9471, at 3rd and Independence Avenue, SW, Washington, DC.  The Acura was wanted in reference to the above-mentioned kidnapping and homicide on June 19, 2018.

19.     USCP Officer Peter Campopiano, who was operating a marked USCP Scout car, attempted to stop the vehicle at 100 Independence Avenue, SE, Washington, DC.  Officer Campopiano activated his emergency equipment and the operator (later identified as GABRIEL BROWN) initially stopped because of traffic.  Officer Campopiano ordered BROWN to comply with the officer's commands.  BROWN then fled striking two vehicles and traveled eastbound in the westbound lane on Pennsylvania Avenue, SE, and continued to flee.  BROWN stopped in the 1100 Block of Pennsylvania Avenue, SE, and let a passenger, SHELITA THOMPSON, out of the vehicle.  THOMPSON was taken into custody by MPD officers.  The vehicle continued to travel at a high rate of speed (at times of 80 mph) eastbound on Pennsylvania Avenue, SE and was being pursued by USCP and MPD.  BROWN drove at a high rate of speed, changed lanes without caution, and ran through multiple solid red lights along Pennsylvania Avenue, SE.  Law enforcement terminated the pursuit because of safety reasons at the Benning Road exit on Interstate 295 traveling towards Maryland.

20.     Detectives brought THOMPSON to MPD to conduct a voluntary, non-custodial interview with her.  Before interviewing THOMPSON, they observed her appearing to attempt to delete information from her cellphone.  MPD seized **TARGET DEVICE 2** from THOMPSON, believing it may contain evidence related to the kidnapping and murder.

10

21.     As noted in paragraph 6(b), *supra*, a search warrant was obtained for **TARGET DEVICE 2** and a digital extraction was done by the DFS Digital Evidence Unit.  Among other items seized were call logs and messages with BROWN (including evidence of efforts by THOMPSON to delete call logs during the target offenses), photographs of BROWN with firearms, evidence of BROWN's connection to the Acura used to pick up the ransom money, and evidence of the phone number used by BROWN during the target offenses.

22.     During the interview with MPD detectives, THOMPSON confirmed that the driver of the Acura at the time she exited was her boyfriend, GABRIEL BROWN.  THOMPSON positively identified a photograph of BROWN.  THOMPSON claimed that on the morning of June 20, 2018, BROWN was at her residence located at 5002 Lee Jay Drive, Capitol Heights, Maryland, and that they went to sleep around 1:00 a.m.  THOMPSON claimed that she awoke at 6:40 a.m., and BROWN was still at her residence.  THOMPSON admitted that BROWN had regular access to her Acura vehicle, and despite being confronted with evidence that her vehicle was being driven during the overnight hours when she claimed to be with BROWN at her residence, she disclaimed any knowledge regarding the use of her vehicle in any crimes.  In a later interview with law enforcement, THOMPSON claimed that on June 19, 2018, she had seen BROWN around 9:30 p.m., near 51st and Fitch Streets, SE, when she drove her Acura to see him.  THOMPSON initially claimed that she picked BROWN up and that they both traveled back to her residence, arriving at around 10:30 p.m.  THOMPSON was confronted by law enforcement officers with phone records establishing multiple phone contacts between her and BROWN between approximately 8:47 p.m., and June 20, 2018, at 1:10 a.m. THOMSPON then modified her statement, claiming that she saw BROWN at 51st and Fitch Streets, around 9:30 p.m., left him there, and returned alone to her residence.  THOMPSON further claimed that at approximately 1:00 a.m., BROWN returned to her

residence at 5002 Lee Jay Drive, at which time she went to sleep and that she did not know where he was located after she went to sleep. After being confronted with phone records showing that she spoke to BROWN at approximately 5:45 a.m., on June 20, 2018, THOMSPON claimed that she had spoken to BROWN, but could not recall the subject of their conversation, and that she next saw him at her residence around 6:40 a.m., when she woke up. THOMPSON claimed that BROWN drove her to work in her Acura that morning, and that they left her residence at approximately 7:40 a.m.

23.     A closer review of the GPS data for the Nissan Maxima showed that on June 20, 2018, at 7:11 a.m., shortly after the homicide and prior to the Maxima travelling to the 600 block of Elmira Street, SE (*see* paragraphs 14-15 *supra*), the vehicle was located at a Lucky Mart convenience store located at 5240 Marlboro Pike, Capitol Heights, Maryland, which is approximately .2 miles from THOMPSON'S residence at 5002 Lee Jay Drive. Video obtained from the Lucky Mart store showed BROWN and in individual later identified as JAMES TAYLOR entering the store at the same time the GPS data showed that that Maxima was located there.

<u>Search of Acura</u>

24.     A search warrant was obtained for the Acura. Inside of the Acura, law enforcement recovered a receipt for a transaction at the Shell gas station from the front passenger seat. The Shell station was located at 5017 Marlboro Pike, Capital Heights, MD (an address that is approximately .6 miles from THOMPSON"s residence located at 5002 Lee Jay Drive). The receipt indicated that the transaction at the gas station occurred at 3:20 a.m. (approximately 90 minutes before the money drop). Law enforcement obtained video footage from the gas station that shows an Acura arriving at the pump and a black male with a slim build and dreadlocks, wearing a white t-shirt, pumping gas. The person's appearance is consistent with GABRIEL BROWN. Further, a

fingerprint analysis revealed that BROWN's prints were on the receipt, and law enforcement has confirmed that the last four digits listed on the receipt seized from the Acura are the same as the last four digits on the debit card belonging to THOMPSON.

Arrest of BROWN

25.     On June 27, 2018, Deputies from the United States Marshals Service located BROWN at his aunt's residence located at 411 West Calhoun, Dillon, South Carolina.  BROWN was arrested pursuant to an arrest warrant issued in the United States District Court for the District of Columbia arising from a Criminal Complaint charging him with violation of 18 U.S.C. § 1073 (Interstate Flight to Avoid Prosecution).

26.     After BROWN fled the Washington, D.C., area, he was in communication with THOMPSON on numerous occasions. THOMPSON advised that she may have sent paperwork regarding the search warrant executed at her residence to BROWN.

Arrest of BROWN and Seizure of TARGET DEVICE 1 and TARGET DEVICE 3

27.     On June 27, 2018, Deputies from the United States Marshals Service located BROWN at his aunt's residence located in Dillon, South Carolina.  BROWN was arrested pursuant to an arrest warrant issued in the United States District Court for the District of Columbia arising from a Criminal Complaint charging him with violation of 18 U.S.C. § 1073 (Interstate Flight to Avoid Prosecution).  **TARGET DEVICE 1** was seized at the time of BROWN's arrest after it was identified by occupants of the residence as belonging to BROWN.

28.     Based on phone records for the device BROWN was using on the night of the target offenses, **TARGET DEVICE 1**, the device seized in South Carolina is a different device than had been used during the target offenses.  However, because the device was seized less than ten days after the commission of the target offenses, while the defendant was on the run from law

13

enforcement, law enforcement obtained a search warrant to search the device based on the likelihood that it would contain evidence of the target offenses.  Additionally, Judge Boasberg has determined that evidence of BROWN's flight will be admissible at trial; accordingly, any evidence on the device regarding that flight will be probative of BROWN's state of mind and his consciousness of guilt.

29.     As described in paragraph 6(a), *supra*, law enforcement obtained a search warrant for **TARGET DEVICE 1**; however, at the time the DFS Digital Evidence Unit attempted to execute the search warrant, technology did not enable them to access data on the device.  A second search warrant was obtained in 2020 after technology advancements had been made that would allow for the analyst to access the device.  A search of data extracted from **TARGET DEVICE 1** revealed evidence of the target offenses, to include: evidence of BROWN's flight to South Carolina and evidence that he dropped his prior phone after the target offenses; evidence of BROWN's connections to MOORE and to the target offenses in internet searches about the target offenses; evidence of ongoing contacts by BROWN with TAYLOR and a close contact of SWEENEY's after the target offenses; evidence of BROWN's knowledge of the target offenses, including a photograph of the location where he had picked up the ransom money with the Acura.

30.     Following BROWN's arrest in South Carolina, a relative transported a number of BROWN's belongings to another relative's house in Maryland. BROWN's belongings included a Louis Vuitton bag containing an iPad (Serial No. DMPVC3RSHP52) (**TARGET DEVICE 3**).  BROWN's relatives provided these items to law enforcement on October 3, 2018. As noted in paragraph 6c, *supra*, law enforcement previously obtained a search warrant for **TARGET DEVICE 3**.  The search warrant was executed at the DFS Digital Evidence Unit.  During the search of the device, law enforcement recovered a number of items of evidence, to include

14

evidence of BROWN's iCloud account; photographs of BROWN and THOMPSON and the Acura; videos/photographs of BROWN with THOMPSON, and what appears to be TAYLOR in the background.

31.     On July 10, 2018, a grand jury sitting in the United States District Court for the District of Columbia returned an indictment against BROWN that charged him with kidnapping, in violation of 18 U.S.C. § 1201(a) and fleeing to avoid prosecution, in violation of 18 U.S.C. § 1073.

<u>Identification and Arrest of James Taylor</u>

32.     According to GPS records, following the homicide, the Maxima traveled to 5002 Lee Jay Drive, Capitol Heights, MD (THOMPSON's residence) where it remained from 6:44 a.m. to 7:09 a.m.  The Maxima then traveled to the Lucky Market convenience store at 5240 Marlboro Pike, Capitol Heights, MD, where it stopped at 7:11 a.m.

33.     Investigators downloaded video surveillance footage from the store, which showed the Maxima backing into a parking space in front of the entrance.  A male suspect exited the left rear seat and entered the store. The male was a heavyset black male, long dreadlock/braided hair, black glasses, wearing a white tank top and jeans.  The male suspect remained in the store for a short period of time and made a transaction, paying with cash. Approximately 30 seconds after the male enters the store, a person identified as BROWN entered the store, talking on a cell phone. BROWN was wearing red and black pants and a white t-shirt, which was consistent with what THOMPSON advised that she had seen him wearing inside the house on the morning of June 20, 2018.

34.     On July 2, 2018, Det. McHugh viewed the video downloaded from the store and immediately recognized the male subject that exited the Maxima as JAMES TAYLOR, nickname

"Butter."   Det. McHugh arrested TAYLOR in 2016 on a probation violation warrant and interviewed him in connection with a separate homicide investigation.   MPD detectives sent the still images of TAYLOR from the store to a confidential source who is familiar with the Benning Park area. The source identified the male by his nickname and said that he came home from jail in May.   A check of Maryland DOC records confirmed that TAYLOR was released in May 2018. Later in the day on July 2, 2018, another confidential source saw TAYLOR in the 5000 block of H Street, S.E., and described his appearance.   Notably, the source said that TAYLOR was wearing "personality glasses."

35.   A search of police databases and public records showed that TAYLOR's address of record is 5216 Central Avenue SE, Washington DC.   Based on this records search, the head of household at this address is Wanda Taylor, a 56 year-old female.   Wanda Taylor is the mother of JAMES TAYLOR.   One of the phone numbers associated with the address and Wanda Taylor is 202-906-0571, which is also subscribed in her name according to phone records.   A review of phone records for 202-222-8501 (the phone used to make the ransom calls) shows that this phone number had frequent contact with Wanda Taylor's telephone.   Furthermore, the ransom phone believed to be used by TAYLOR was traced to calls made to an inmate at the Bureau of Prisons. Law enforcement obtained recorded jail calls for this inmate, which revealed calls with TAYLOR's phone, 202-222-8501, for the period of May 10, 2018 through June 13, 2018, and found that listed on the inmate's caller list was the ransom phone number, 202-222-8501, and the contact name was "Big Butter," which is TAYLOR'S known alias.   Furthermore, during some of the recorded calls, TAYLOR is referred to by his alias, "Butter."

36.   On July 31, 2018, a superseding indictment was returned by a grand jury sitting in the United States District Court for the District of Columbia, which charged MOORE, BROWN,

16

and TAYLOR with Kidnapping, in violation of 18 U.S.C. § 1201(a)(1), MOORE and TAYLOR with Using, Carrying, Possessing, and Brandishing a Firearm during a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1), and BROWN with Interstate Flight to Avoid Prosecution, in violation of 18 U.S.C. § 1073.  On August 17, 2018, TAYLOR was arrested on a bench warrant issued upon his indictment in the aforementioned superseding indictment.

<u>Search of Maxima and DNA Testing</u>

37.     On June 21, 2018, a search warrant was obtained for the Maxima (18-sw-00163 [Judge Robin M. Meriweather]).  Evidence seized from the Maxima, included: masks and gloves, zip ties, a firearm and ammunition.  The vehicle was also processed by technicians for fingerprints and DNA.  A latent fingerprint analyst identified the fingerprints of BROWN and MOORE on and/or inside of the Maxima, and MOORE and SWEENEY's DNA was found on a glove recovered from inside the Maxima.  Additionally, the DNA profile of the decedent was also found within the vehicle, including suspected blood on the interior window of the rear passenger window of the vehicle.

38.     During the course of the DNA testing, a single source male DNA profile was identified on a Sprite bottle opening and cap that was inside of the Maxima.  The decedent, MOORE, BROWN, and TAYLOR were all excluded as the source of this profile.

39.     The single source male DNA profile from the Sprite bottle was entered into Combined DNA Index System (hereinafter, CODIS).  CODIS is the United States national DNA database created and maintained by the Federal Bureau of Investigation.  A match was identified in CODIS to a DNA profile associated with John Sweeney (FBI # 822029ED1).  A formal DNA comparison was conducted with SWEENEY's known DNA sample and the results of the CODIS match were confirmed.  Furthermore, DNA testing of additional items recovered from both the

17

Maxima and the Acura confirmed the presence of SWEENEY's DNA.

<u>SWEENEY's Connections to MOORE, BROWN, and TAYLOR</u>

40.    30.    On June 20, 2018, SWEENEY was under the supervision of the Court Services and Offender Supervision Agency (CSOSA).   SWEENEY's address of record with CSOSA was 612 Elmira Street, SE, Washington, D.C.   Additionally, Sweeney has a valid DC driver's license, which lists 612 Elmira Street, SE, as his home address.   The Elmira Street, SE address associated with SWEENEY is consistent with the location where the Maxima used during the kidnapping stopped for 50 seconds beginning at 7:38 a.m., on June 20, 2018 (after the Maxima had been at the scene of the homicide, at the Lucky Mart, and at THOMPSON's address). Additionally, SWEENEY's physical appearance appears consistent with the individual who can be seen exiting the Maxima on the CCTV video, as described above.

41.    As part of CSOSA's supervision of SWEENEY, he had provided a phone number of (240) 860-3184 (Sweeney Phone).   During the course of this investigation, law enforcement obtained call detail records for the Sweeney Phone.   The subscriber records indicate that the number is subscribed to "Donald Jordan" at an address of "3745 BRANCH AVE TEMPLE HILLS MD 20748-1410."   The 3745 Branch Avenue address is the location of a MetroPCS store and is frequently listed by individuals who obtain phones from that store (rather than providing the true address associated with the subscriber).

42.    The Sweeney Phone has a number of contacts with BROWN, MOORE, and TAYLOR.   Specifically, the Sweeney Phone has approximately 25 contacts with BROWN [(571) 351-7471] between June 17, 2018 and June 25, 2018, including calls on the evening of the kidnapping (June 19, 2018) from 8:49 p.m. – June 20, 2018 at 1:50 p.m.   Several of the calls between the Sweeney Phone and BROWN were over 20 minutes in duration.

18

43.     The Sweeney Phone has approximately 13 contacts with MOORE [(301) 996-7650] between June 10 and June 25, 2018, including three contacts on June 19, the day of the kidnapping, between 3:11 p.m. and 3:56 p.m.   Additionally, the Sweeney Phone has approximately five contacts with TAYLOR [(202)222-8501] on June 10, 2018.

44.     In light of the match of SWEENEY's DNA profile on the Sprite bottle in the Maxima, the Maxima's stop on Elmira Street shortly after the homicide (and CCTV video capturing an individual consistent with SWEENEY exiting the Maxima), and the phone contacts with the three charged defendants, on January 8, 2019, your affiant obtained historic cell site data from T-Mobile for the Sweeney Phone (Case No. 19-SW-3).

45.     Your affiant has reviewed the cell site locations for the Sweeney Phone and based upon the location of the cell site data, the location of the Sweeney Phone is consistent with the locations of the Maxima and the Moore Phone from before the abduction on St. Michael's Drive in Bowie, Maryland, until approximately 4:30 a.m., on June 20, 2018, when there is a break in cell site activity on the Sweeney Phone.  The Sweeney Phone again begins connecting with cell towers at 6:48 a.m., on June 20, 2018, and the location of the device at that time is consistent with the location of the Maxima at Lee Jay Court.

Related Home Invasions

46.     Data from the iClouds of MOORE and BROWN has provided evidence of prior armed home invasions, including instances where the decedent and his associates were targeted in the weeks and months leading up to the charged kidnapping.  This data includes communications between MOORE and BROWN regarding plans and locations for such offenses.  Additionally, MOORE's iCloud includes an incoming message from TAYLOR in which TAYLOR provides the address for an armed home invasion that occurred in College, Park, Maryland later that same day

19

(May 22, 2018).  A records search of the Prince George's County Police confirm a report of a home invasion at the address provided by TAYLOR on this date.  Evidence from the iClouds of MOORE and BROWN also contain images of their access to firearms, including images shared between SWEENEY and BROWN of a firearm that has been linked ballistically to the shell casings recovered at the scene of the murder of Simmons.

47.     Based upon the foregoing facts, your affiant submits that there is probable cause to believe that BROWN, TAYLOR, MOORE, and SWEENEY participated in the kidnapping and murder of Andre Simmons, and that there is evidence related to the target offenses located within the stored memory of the **TARGET DEVICES**.

48.     Although data has already been extracted from **TARGET DEVICE 1**, **TARGET DEVICE 2**, and **TARGET DEVICE 3**, by the DFS Digital Evidence Unit, this search warrant seeks authorization for a second examination of the devices by another forensic analyst who is not employed at DFS.[2]  The U.S. Attorney's Office is seeking to have these items of evidence examined by an outside examiner after learning that on April 2, 2021, the ANSI National Accreditation Board ("ANAB") had informed DFS that it was "immediately suspending the laboratory's accreditation and initiating the process for withdrawal of accreditation."  Given the issues surrounding the DFS's accreditation, the government is seeking to have evidence re-examined where feasible (including the **TARGET DEVICES** described herein).

---

[2] DFS was unable to extract data from **TARGET DEVICE 4**, however, there now appears to be technology that may allow data to be extracted from the device and, accordingly, law enforcement is seeking authorization to conduct a forensic examination of **TARGET DEVICE 4**.

## TECHNICAL TERMS

49.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage

devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

      b.    "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

      c.    A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise.  Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as

22

described above, and personal computers, perform many different functions and save data associated with those functions.

        d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.     "Computer software" means digital information, which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

50.     Based on my training, experience, and research, I know that the **TARGET DEVICES** have the capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

51.     As described above and in Attachment B, this application seeks permission to search for information that might be found within the **TARGET DEVICES**.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Device for at least the following reasons:

a.     Individuals who engage in criminal activity, including kidnapping and robbery offenses use digital devices, like the target device, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the target device, documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators,

24

including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; and records of financial transactions related to the illegal conduct, including transfer and disposition of proceeds of illegal activity.

      b.     Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

      c.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed

Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

52.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital devices were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in the device at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the devices, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual

26

memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.   Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is

27

a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

53.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.    Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being

searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital

device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e.     Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.

For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

      f.   Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

      g.   In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.      The digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B.

2.      The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

**AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

54.      Because forensic examiners will be conducting their search of the digital device in a law enforcement setting over a potentially prolonged period of time, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

**<u>CONCLUSION</u>**

55.     Based on the all of the forgoing information presented in this affidavit, your affiant

submits that there is probable cause for a warrant to search the **TARGET DEVICES** described in

Attachment A and to seize the items described in Attachment B.

_____

Riley Palmertree
Special Agent
Federal Bureau of Investigation


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on May 28, 2021.



_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

33